# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ORA A. WILLIAMSON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 08 CV 3906** |
| | ) | |
| **MICHAEL ASTRUE**, | ) | **Magistrate Judge Young B. Kim** |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | **July 16, 2010** |

## MEMORANDUM OPINION and ORDER

Before the court is Ora Williamson's motion for summary judgment challenging a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382c, for the period from September 8, 1995, through January 2, 2001. Williamson is currently receiving SSI based on the Commissioner's previous finding that beginning on January 2, 2001, Williamson was disabled by depression. In the current motion, Williamson argues that she was disabled as early as September 8, 1995, and at least by December 31, 1999 (her date last insured), by a combination of carpal tunnel syndrome, back pain, and depression. She seeks back payments of DIB and SSI beginning in September 1995. For the following reasons, Williamson's motion is denied:

## Procedural History

Williamson's claims have followed a long procedural path that has now stretched into its fifteenth year. Williamson first applied for DIB and SSI in January 1996, claiming that she was disabled as of September 8, 1995, by carpal tunnel syndrome and high blood pressure. (A.R. 127-29, 139.) The Social Security Administration ("SSA") denied her claim initially and on reconsideration. (Id. at 96-97.) Williamson then requested, and was granted, a hearing before an administrative law judge ("ALJ"). On November 17, 1998, ALJ James A. Horn issued a decision concluding that Williamson was not disabled. (Id. at 101-07.) He found that she suffered from a "severe history of carpal tunnel syndrome and hypertension," but he considered her complaints of pain to be "far out of proportion" to objective clinical findings. (Id. at 106-07.) After Williamson sought review, the SSA's Appeals Council vacated the decision and remanded the case because it concluded that Judge Horn had inadequately evaluated the opinion of Williamson's treating physician regarding the limitations caused by her carpal tunnel syndrome. (Id. at 124-26.)

In response to the Appeals Council's decision, in August 2000 Judge Horn remanded Williamson's case to the Illinois State Agency to further evaluate her carpal tunnel syndrome and to consider new evidence that Williamson was suffering from depression. (A.R. 421-22.) On remand, the agency considered Williamson's complaints of carpel tunnel syndrome, chest pain, hypertension, and depression, but concluded that those impairments did not render her disabled. (Id. at 435.)

2

Williamson again sought a hearing on her claims, and this time her case was heard by ALJ Kenneth E. Stewart. (A.R. 659.) In December 2001, Judge Stewart issued a decision that was partly favorable to Williamson. (Id. at 428-34.) He determined that beginning on January 2, 2001, Williamson met the listing criteria for depression. (Id. at 432.) But Judge Stewart found that neither Williamson's depression nor any of her physical impairments were sufficiently severe before January 2001 to have prevented her from performing her past relevant work. (Id. at 433.) Accordingly, Judge Stewart determined that Williamson was not disabled as of December 31, 1999—her date last insured—and therefore is not eligible for DIB. He concluded that she is entitled to SSI, but only for the period beginning after January 2, 2001. (Id. at 433-34.)

Williamson appealed and argued that Judge Stewart erroneously concluded that she was not disabled before January 2, 2001. (A.R. 444.) This time the Appeals Council vacated the decision only with respect to the issue of disability before January 2001. (Id. at 446-48.) The Appeals Council remanded the case for the ALJ to explain the weight he gave to the opinion of treating physician Dr. Rhea Craigin, to evaluate the opinion of treating physician Dr. Daniel Torres, and to provide a function-by-function analysis of Williamson's residual functional capacity ("RFC") from September 1995 through January 2001. (Id. at 446-47.)

On remand Williamson's claims were transferred from the SSA's Oak Brook office to the Chicago office, and accordingly, they were heard by yet another ALJ, Judge Helen Cropper. (A.R. 712.) On January 28, 2005, Judge Cropper issued a 38-page decision

concluding that Williamson was not disabled before January 2, 2001. (Id. at 36-73.)

Williamson appealed, but this time the Appeals Council denied review, (id. at 10-14), making

Judge Cropper's decision the final decision of the Commissioner, *see Schmidt v. Astrue*, 496

F.3d 833, 841 (7th Cir. 2007). Williamson then filed the current suit seeking judicial review

of the 2005 decision. *See* 42 U.S.C. § 405(g). The parties have consented to this court's

jurisdiction. *See* 28 U.S.C. § 636(c).

### Facts

The substantial administrative record in this case covers the period from 1995 through

2005, but because the relevant question is whether Williamson was disabled before January

2, 2001, the post-2001 evidence is relevant only to the extent that it sheds light on her

condition before that date. Williamson claims that her disability began on September 8,

1995, when at the age of 48 she left her job as an assembly-line worker at a company called

Reflector Hardware. (A.R. 724, 729, 732.) She claims that she was forced to stop working

based on a combination of carpel tunnel syndrome and back pain, and that beginning around

1998, she was disabled by depression. (Id. at 743, 746, 755.) At her 2003 hearing before an

ALJ, Williamson provided both documentary and testimonial evidence in support of her

claims.

### A.     Williamson's Evidence

The bulk of Williamson's evidence from the period between September 1995 and

February 2000 relates to her carpal tunnel syndrome. Williamson testified that she could not

4

work after she left her assembly line job at Reflector Hardware in 1995 because she was experiencing pain from her fingers to her shoulders. (A.R. 743.) She testified that in the years that followed the pain increased and she often woke up in the mornings feeling numbness in her hands. (Id. at 744.) Williamson said that the numbness and tingling pain was in her fingers and the top of her hands, rather than the palms, and that the pain was worse in her left hand. (Id. at 747.) She explained that she had wrist surgery in June 1996 and that afterward her surgeon told her not to go back to her previous work. (Id. at 746.) According to Williamson, the surgery "didn't do any good." (Id. at 752.) Williamson testified that since 1995 she would feel pain in her hands if she lifted anything as heavy as a gallon of milk. (Id. at 770.) She testified that she takes Ibuprofen for her hand pain and that a doctor had prescribed a pain medication (she did not identify it by name) that she takes "sometimes." (Id. at 777.)

Williamson also submitted documentary evidence in support of her claim that her carpal tunnel syndrome was disabling as early as the fall of 1995. She submitted medical records completed by Dr. Judd Jenson (a neurologist), Dr. Michael Bednar (a hand specialist), and Williamson's primary care physician, Dr. Craigin, who separately reported in late 1995 and early 1996 that Williamson suffered from carpal tunnel syndrome that was worse on her left side. (Id. at 211, 222, 250-51.) Dr. Bednar recommended surgery, (id. at 222), which was performed in June 1996, (id. at 253). Just before the surgery, in May 1996 a medical consultant, Dr. Douglas M. Grover, completed an RFC assessment in which he

opined that Williamson could sit, stand, or walk for six hours in an eight-hour day, but that she was limited in handling and fingering. (Id. at 164-65.)

After undergoing carpal tunnel surgery, Williamson completed a disability report in which she stated that she felt improvement initially following the surgery, but that her condition had again worsened and she had trouble gripping or picking things up. (A.R. 172.) In January 1997 she was examined by Dr. Rodney Shainis, who reported that Williamson "appeared well" in general and that her right wrist appeared normal, although she had swelling and decreased extension in her left wrist. (Id. at 275.) Dr. Shainis diagnosed "bilateral hand pain which may or may not represent carpal tunnel syndrome." (Id.) That same month, a second medical consultant, Dr. Robert T. Patey, completed an RFC assessment agreeing with Dr. Grover's finding that Williamson could sit, stand, or walk for six hours a day, but opining that after the surgery she was not limited in fingering or handling. (Id. at 179-81.)

In February 2000 Williamson's rheumatologist, Dr. Torres, signed a form stating that Williamson had been disabled since September 1996 by carpal tunnel syndrome. (A.R. 401.) He simply checked a box on the form, which does not provide room for elaboration. (Id.) Eight months later consulting physician Dr. Shital Shah examined Williamson in connection with her ongoing disability proceedings. (Id. at 525-26.) He reported that she had normal range of motion in her fingers but was only able to make a partial fist and had diminished grip strength. (Id. at 527-28.) In May 2001 Dr. Torres completed an RFC assessment

6

characterizing the prognosis of her carpal tunnel syndrome as "poor," and reporting that her response to treatment was "suboptimal." (Id. at 559.) Dr. Torres opined that the pain associated with her carpal tunnel syndrome was sufficiently severe to interfere with her attention and concentration frequently and that she had significant limitations in repetitive handling or fingering. (Id. at 560-61.) Dr. Torres's RFC assessment was supported by treatment records stemming back to 1998 in which he described her carpal tunnel syndrome symptoms as "persistent." (Id. at 578.)

At the hearing Williamson also described her depression, which, according to her testimony, began in 1998 or 1999. (A.R. 755.) She testified that during that time she was crying often, her energy was low, and she couldn't sleep without taking a sleeping pill. (Id. at 780.) She said that sometime around 1998 or 1999 (she was unclear on dates) she was hospitalized because of her high blood pressure, and the doctor who treated her there prescribed Prozac to treat her depression. (Id. at 756-57.) She then clarified that she first obtained the prescription in February 2000 and said that she had been taking Prozac continuously since then. (Id. at 757.) After the hospitalization she started seeing a psychiatrist named Dr. Iveta Boyencheck, who continued to prescribe Prozac. (Id. at 758-59.) Judge Cropper pointed out that Dr. Boyencheck had noted several times that Williamson had not taken the Prozac regularly, but at the hearing Williamson insisted that she had. (Id. at 759.)

In addition to describing her depression Williamson submitted treatment and consultative records from a number of medical sources. Progress notes from a mental health clinic show that beginning in February 2000 Williamson sought counseling for depression. (A.R. 416-19.) In September 2000 Dr. Shah reported that Williamson was "depressed" and "stressed out" and was taking Prozac and Ativan for "her nervousness." (Id. at 528.) In her initial assessment of Williamson in January 2001, Dr. Boyancheck noted that Williamson had reported feeling depressed for the past two to three years. (Id. at 598.) Seven months later, in the summer of 2001 Dr. Boyanchek reported that Williamson's depression left her with "no useful ability" to "deal with normal work stress." (Id. at 582.)

There are two reports in the record from September 2000 in which separate consulting physicians, Dr. William N. Hilger and Dr. Terry A. Travis, report skepticism regarding the validity of Williamson's claims of depression. Dr. Hilger examined Williamson and conducted psychological testing at the SSA's behest. (A.R. 531-35.) He reported that before examining Williamson he consulted Judge Horn's original decision denying her disability claim and noted that he found it "interesting" that Judge Horn concluded she could perform light work. (Id. at 531.) Dr. Hilger found Williamson "vague and evasive" during the examination and based on his perception of her "questionable effort" in answering his questions, he diagnosed her with "probable malingering disorder." (Id. at 534.) He noted that Williamson "did appear to be somewhat depressed but in view of her malingering likely appears to be more depressed than she may actually be." (Id.) He conveyed his suspicion

that she was not taking her Prozac regularly. (Id.) Consulting physician Dr. Travis reviewed the file in November 2000 and agreed that there "is no valid medical evidence of a psychiatric disorder" and stated that Williamson was probably malingering. (Id. at 548.)

Williamson also presented evidence regarding her shoulder, hip, and back pain. Williamson testified that in July 1998 she reported shoulder pain to Dr. Torres, who gave her pain shots "all over" her hands and arms as treatment. (Id. at 751.) She said the treatment did not help her pain. (Id.) She explained that since 1999 or 2000 she has had a pinched nerve in her back that has caused pain in her hips and leg. (Id. at 771.) Her back pain became worse after she was involved in a bus accident in September 2001. (Id. at 771-72.) She said that a car collided with a city bus she was riding, and that the point of impact was close to where she was sitting. (Id. at 788.) Williamson testified that even before the bus accident, her hip and back pain made it hard for her to stand up or walk. (Id. at 771.) She said that before the bus accident she could walk about a block, but after she could only walk half a block. (Id. at 772.) Williamson also testified that beginning in 2000 or 2001 she had back pain even while sitting. (Id. at 772-73.)

Williamson's documentary evidence includes only scattered references to her back pain and her difficulty walking during the relevant period. In November 1996 Dr. Craigin noted that she had complained of a back ache, but the complaint coincided with other symptoms of pneumonia. (A.R. 290-92.) In April 1997 Dr. Craigin reported that Williamson had "no problem" walking, sitting, or standing. (Id. at 281-82.) That fall Dr. Craigin noted

Williamson's complaints of back and knee pain, but her notes do not indicate whether she recommended any treatment. (Id. at 325-27.) In February 1999 Dr. Torres reported that Williamson had complained about pain in her right upper back, and he gave her an injection of lidocane. (Id. at 571.) But in 2000 Dr. Shah reported that Williamson had a normal gait, no tenderness in her back muscles, and a normal range of back motion. (Id. at 526-27.) X-rays taken after the 2001 bus accident showed no evidence of a spine fracture, but revealed degenerative changes with disc space narrowing at one area of the lower back. (Id. at 640-41.)

### B.   Medical Expert's Testimony

Judge Cropper called Dr. Daniel D. Girzades, an orthopedist, to testify at the hearing as a medical expert. (A.R. 453, 783.) Williamson stipulated to his qualifications to testify as a surgeon and medical specialist, but not as an expert in psychiatric matters. (Id.) Before giving his opinion based on his review of Williamson's medical file, Dr. Girzades asked Williamson to elaborate on her pain description. She emphasized that both before and after her carpal tunnel surgery her pain has been located in the tops of her hands and in her wrists, but not in her palms. (Id. at 784-85.) Dr. Girzades asked her to explain how her back pain limited her before the September 2001 bus accident. (Id. at 787-88.) Williamson said that she sometimes "had a problem" with her back and hip. (Id. at 788.)

After Williamson answered his questions, Dr. Girzades gave his opinion as to how her impairments limited her before January 2, 2001. He explained that he saw "a lot of

ambiguity" in the record, because Williamson complained of pain in the top of her hand, but carpal tunnel syndrome involves the palmar side of the hands. (A.R. 790.) He pointed out that she testified that her hand and wrist pain was the same both before and after the surgery, but a 2001 EMG test showed that her left hand and arm were normal. (Id.) Dr. Girzades nonetheless opined that she was impaired by carpal tunnel syndrome during the relevant period, although in his opinion the condition was insufficiently severe to meet or medically equal any listing. (Id. at 792-93.) He stated that Williamson could stand for two hours in an eight-hour day and could sit for six hours in an eight-hour day. (Id. at 793.) When asked to explain the basis of that assessment, Dr. Girzades said that Williamson "had radiculopathy with a possible herniated disc that may have been a problem for her prior to the bus accident." (Id. at 794.) Pressed further, Dr. Girzades said that he saw no objective evidence or subjective complaints of back or hip trouble before January 2001. (Id.) He then clarified that if he were considering only the pre-2001 evidence, he would not limit her to standing for two hours. (Id. at 795.) Dr. Girzades said he has "no way of knowing" whether it was before or after January 2001 when her back pain deteriorated to the point where she could no longer stand throughout the work day. (Id.)

### C. Vocational Expert's Testimony

Vocational expert Julie Lynn Bose testified regarding the kinds of work that a person who had several variants of hypothetical limitations could perform. (A.R. 803.) She opined that a person of Williamson's age during the relevant period with an RFC for light work

could perform all of Williamson's past relevant work, with the exception of machine press operator. (Id.) When Judge Cropper altered the hypothetical to add limitations in fingering and repetitive hand and foot use against resistance, Bose said that would preclude Williamson's past work. (Id. at 803-04.) But Bose explained that a person with the hypothetical limitations Judge Cropper had cited would be able to perform several light, unskilled jobs, including order caller, laundry folder, and general office clerk. (Id. at 805.) She testified that there are more than 1,000 such jobs in each of those categories in the Chicago area. (Id.) Judge Cropper then asked what jobs would exist if a person were limited to sedentary work, with the same hypothetical limitations in fingering and repetitive hand use that she had posed with respect to light work. (Id.) Bose testified that a person with those restrictions could work as a telephone research clerk, a telephone marketing clerk, and a telephone quotation clerk, and that each of those types of jobs existed in the Chicago area at numbers upwards of 2,000. (Id. at 805-06.) Bose further testified that a person who would lose focus and stray from job tasks for more than five minutes in any hour would be unable to perform any unskilled work, whether light or sedentary. (Id. at 807.)

### D. The ALJ's Decision

After considering the proffered evidence, Judge Cropper concluded that Williamson was not disabled prior to her date last insured, and was not entitled to an SSI onset date earlier than January 2, 2001. (A.R. 72-73.) In so finding, Judge Cropper applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520, which requires her to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant
> has a severe impairment; (3) whether the claimant's impairment meets or
> equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R.
> § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work;
> and (5) whether the claimant is capable of performing work in the national
> economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309,

313 (7th Cir. 1995)).  If at step three of this framework the ALJ finds that the claimant has

a severe impairment which does not meet the listings, she must "assess and make a finding

about [the claimant's] residual functional capacity based on all the relevant medical and other

evidence."  20 C.F.R. § 404.1520(e).  The ALJ then uses the RFC to determine at steps four

and five whether the claimant can return to her past work or to different available work.  *Id.*

§ 404.1520(f), (g).  Although the claimant bears the burden of proof through step four, if the

analysis proceeds to step five it is the Commissioner's burden to show that the claimant can

perform jobs that exist in the national economy.  42 U.S.C. § 423(d)(2)(A); *Clifford*, 227

F.3d at 868.

Here, at steps one and two of the analysis the ALJ determined that Williamson had

not been employed since September 9, 1995, and that during the period from 1995 through

January 2001 she had severe impairments in the form of carpal tunnel syndrome and

tendinitis of the right shoulder.  (A.R. 40-41.)  The ALJ also determined that Williamson

"may have had at least a mild degree of depression prior to" her date last insured—December

31, 1999—but that the record does not clearly establish that her depression was severe before

that date.  (Id. at 41.)  At step three, the ALJ determined that none of Williamson's physical

or mental impairments met or equaled the criteria of any of the Commissioner's listings. (Id. at 41-45.)

In her extensive step-four analysis, the ALJ determined that during the relevant period Williamson had an RFC "to perform and sustain a wide range of light work." (A.R. 63.) She concluded that Williamson could sit, stand, or walk throughout a workday with typical breaks and that her impairments would not have significantly limited her ability to concentrate or stay on-task. (Id.) The ALJ determined that she would have been limited in things like carrying more than 10 pounds or pushing and pulling against resistance, and she specified that Williamson would have been able to handle or finger with her left hand only occasionally and with her right hand only frequently (rather than constantly). (Id.) In reaching that determination, the ALJ explained that of the medical opinions of record, she gave the greatest weight to those of Drs. Girzades and Torres, but where there was a conflict between the two, she prioritized Dr. Girzades's, because he was an orthopedic specialist who had the benefit of reviewing Williamson's entire medical history and was "familiar with disability program requirements." (Id. at 58-59.)

The ALJ gave several reasons to explain why she could not fully credit Williamson's descriptions of her pain. (A.R. 59-63.) She noted that there were gaps in the record where Williamson would not seek treatment for some time, but then would return to the doctor with complaints of pain at key moments in the disability claim proceedings. (Id. at 62.) The ALJ pointed out that the pharmacy records do not support Williamson's assertions that she

continuously filled her prescriptions for Prozac, and that Williamson had not explained her failure to fill those prescriptions and others for pain medication. (Id. at 61-62.) The ALJ further noted that the evidence from the relevant period showed that Williamson had greater use of her hands then she described at the hearing, and her contemporaneous statements to her doctors did not match the symptoms she described at the hearing. (Id. at 62.) As for Williamson's depression, the ALJ noted that she did not seek treatment until early 2000, and even then she discontinued counseling after only two visits. (Id.) The ALJ further noted that Williamson did not fill her Prozac prescriptions during 2000 and reported "virtually normal social activities" during the relevant period, describing limits in her daily activities caused by pain rather than depression. (Id.)

The ALJ found that Williamson's RFC during the relevant period prevented her from performing her past work, but based on the vocational expert's testimony, at step five she concluded that Williamson could perform a number of other jobs that exist in the national economy. (A.R. 65-66.) Specifically, she found that prior to Williamson's date last insured she could have performed light work including the jobs of order caller, laundry folder, and general office clerk. (Id. at 65.) She also concluded that Williamson could have performed sedentary jobs including telephone quote clerk, telephone research clerk, and telephone marketing clerk. (Id.) Accordingly, the ALJ concluded that Williamson is not entitled to DIB, and after further consideration of the evidence from the period ranging from her date

last insured to January 2, 2001, she concluded that Williamson is not entitled to an earlier disability onset date for purposes of SSI.  (Id. at 66, 71.)

## Analysis

 In her motion for summary judgment, Williamson raises three main challenges to the ALJ's 2005 decision.  First, she argues that the ALJ's finding that she could have sustained the walking and standing requirements for light work was unsupported by substantial evidence and marred by legal error.  Second, she argues that the ALJ's determination that Williamson's depression or pain would not have forced her to be off-task more than rarely during the workday is similarly unsupported and erroneous.  Finally, she argues that the ALJ failed to meet her burden to show that Williamson was capable of performing any of the jobs the ALJ cited at step five of the disability analysis.

In reviewing the Commissioner's decision denying disability benefits, this court asks only whether the ALJ applied the correct legal standards and reached a decision that is supported by substantial evidence.  42 U.S.C. § 405(g); *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  This court reviews the entire record in making the substantial evidence determination, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Clifford*, 227 F.3d at 869.  The court must affirm the ALJ's decision if

reasonable minds could differ regarding whether the claimant is disabled. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Williamson first argues that the ALJ erroneously found that she could fulfill the standing and walking requirements for light work because, according to Williamson, the ALJ ignored important aspects of Dr. Girzades's testimony and relied only upon that evidence which supported her conclusion. Although Williamson is correct that an ALJ cannot cherry-pick the evidence that supports her conclusion, *see Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004), that is not what happened here. The ALJ catalogued the medical evidence that supported and detracted from Williamson's claims in meticulous detail over the course of her exhaustive decision. She acknowledged that Williamson had complained of back pain in connection with a bout of pneumonia in late 1996 and again in the fall of 1997, and that three weeks before her hearing with Judge Horn she complained to a clinic doctor that knee pain was making it hard for her to walk. (A.R. 48-50.) The ALJ also acknowledged Williamson's complaints in August and September 2000 concerning swelling in her feet and legs, (id. at 55), but noted that in March 2002 Williamson specifically attributed her back pain to the September 2001 bus accident in reports to her doctor, (id. at 53). The ALJ further noted that Dr. Torres—Williamson's rheumatologist and the author of the RFC which Williamson thinks deserves significant weight—offered no opinion regarding whether or how Williamson's impairments impacted her ability to sit, stand, or walk during the relevant period. (Id. 58.) The ALJ's thorough discussion of the record belies Williamson's

suggestion that she ignored key evidence, and tellingly, although it was her burden to prove that her pain was disabling during the relevant period, *see Clifford*, 227 F.3d at 868, Williamson points to no remaining evidence from the relevant period that the ALJ supposedly overlooked.

Focusing on Dr. Girzades's opinion, Williamson argues that the ALJ should have credited his original testimony that she was limited to standing and walking for only two hours in a workday—a limitation that would restrict her to sedentary, rather than light work. Williamson asserts that with a limitation for sedentary work, the Commissioner's medical-vocational guidelines direct a finding that she was disabled as of her 50th birthday, which fell on February 14, 1997. *See* 20 C.F.R. 404, Subpt. P, App. 2, Grid Rules 201.09, 201.10. Williamson acknowledges that when pressed to narrow his opinion to the period leading up to January 2001, Dr. Girzades retracted the limitation on standing and walking, but she argues that because he could not identify when her condition deteriorated to the point that she was limited to sedentary work, the ALJ should have ignored his retraction.

Williamson's complaints about the ambiguity in Dr. Girzades's testimony would be more convincing if the ALJ had relied solely on his testimony to conclude that she could perform light work during the relevant period, but that determination was based on a combination of factors, all explained in detail by the ALJ and supported by the record. The ALJ found it significant that Dr. Girzades noted that Williamson never complained of severe back pain until after the 2001 bus accident and that he saw no significant limitations in her

ability to stand or walk in 1995. (A.R. 57.) The ALJ considered Williamson's testimony that her back pain began before the accident and limited her ability to stand or walk, but found her testimony less than credible. (Id. at 60, 62.) The ALJ noted that Williamson's contemporaneous statements to her doctors regarding her pain did not match her description at the hearing. The ALJ also pointed out that she did not aggressively seek treatment for back pain and did not fill prescriptions for pain medication. (Id. at 62.) Thus even though Dr. Girzades was unable to pinpoint the moment at which Williamson's back pain limited her to sedentary work, the ALJ's finding that those limitations began after January 2001 (and likely after the September 2001 bus accident), is supported by substantial evidence. *See Eichstadt*, 534 F.3d at 665.

Williamson also attacks the ALJ's credibility determination, in particular faulting the ALJ for drawing what she considers to be improper negative inferences from the absence of pharmacy records proving Williamson filled her various prescriptions. Challenging an ALJ's credibility determination is an uphill battle, because this court will reverse only if the credibility assessment is patently wrong, *see Schmidt*, 496 F.3d at 843, meaning it "lacks any explanation or support," *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Williamson argues that the ALJ did not ask the requisite questions to flesh out whether Williamson's impairments prevented her from filling the prescriptions, but that argument is misplaced because Williamson testified that she *did* fill her prescriptions. (A.R. 758-60.) Williamson now asserts that she occasionally received free samples of her medication, but she cites no

record evidence supporting that assertion. (R. 42, Pl.'s Br. at 19.) And contrary to Williamson's argument, the ALJ did not find her lacking in credibility simply because she could not provide matching pharmacy records for all of her prescriptions. The ALJ acknowledged that the pre-1996 medication records may have been purged by the pharmacies, and did not fault Williamson for the absence of those records. (Id. at 62.) But, she did not rely solely on the absence of pharmacy records to find that Williamson failed to fill prescriptions; she noted that Dr. Boyanchek had questioned Williamson's compliance with treatment and had "verified with the pharmacy that [Williamson] was not truthfully reporting that she was taking Prozac during one part of the course of treatment," despite having medical insurance that covered prescriptions. (Id.) Most importantly, the absence of verifying prescription records was but one of many factors the ALJ cited to support the credibility determination—others included the disparity between her testimony and her previous statements to her doctors, her failure to seek more aggressive treatment for her pain, the inconsistency between her claims and her description of her daily activities,[1] her tendency to complain to doctors of pain during developments in her disability proceedings, and

---

[1] Williamson tacked two undeveloped assertions onto her credibility argument: first, that the ALJ failed to consider her impairments in combination, and second, that "when reviewing daily activities, the ALJ must do so keeping in mind not just the activities themselves, but how they are performed as well." (R. 42, Pl.'s Br. at 19.) These blanket statements tell the court nothing about how her combination of impairments supposedly limited her and whether she thinks the ALJ overlooked helpful evidence regarding how she performed daily activities. Because the arguments are undeveloped, the court need not address them. *See Gold v. Wolpert*, 876 F.2d 1327, 1332 (7th Cir. 1989) (noting that "perfunctory and underdeveloped assertions hardly constitute an 'argument' and will not be considered").

consulting psychologist Dr. Hilger's suspicion that she was malingering. (Id. at 62-63.) Accordingly, the ALJ's credibility finding is both thoroughly explained and supported by substantial evidence. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2005) (finding ALJ's credibility decision not patently wrong where accounted for diversity of factors supported by record).

Which brings the discussion to Williamson's argument that because the ALJ relied in part on the report of Dr. Hilger—who cast Williamson as a probable malingerer—the ALJ's evaluation of her physical and mental limitations is tainted with bias, or at least the appearance of bias. According to Williamson, Dr. Hilger's report is biased because the only record the SSA gave him to review before examining her was the initial ALJ decision—which had been vacated by the Appeals Council—finding her capable of light work. Williamson asserts that Dr. Hilger's report must have been colored by his review of the vacated decision, and thus argues that the ALJ's partial reliance on his report constitutes harmful error.

Williamson has not demonstrated that Dr. Hilger's report, and more importantly, the ALJ's decision, is the product of bias. Dr. Hilger did not base his evaluation solely on the original ALJ's decision; he physically examined Williamson and conducted a number of objective tests which led him to conclude that she was putting forth questionable effort and possibly exaggerating her symptoms. (A.R. 534.) His was not the only medical opinion of record to reach that conclusion—Dr. Travis and a psychoneurologist who evaluated

Williamson in 2001, Dr. Lee, both concluded that she likely was overstating her symptoms. (Id. at 548, 606-07.) But even if Williamson had shown that Dr. Hilger's conclusions are the product of bias rather than his own observations, in reviewing the ALJ's decision this court starts with the presumption that the ALJ was unbiased. *See Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982). To demonstrate otherwise, Williamson would have to show that the ALJ had shown "deep-seated and unequivocal antagonism that would render fair judgment impossible," *see Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007) (quoting *Liteky v. United States*, 510 U.S. 540, 556 (1994)), and must pursue that claim before the Appeals Council before raising it at the level of judicial review, *see* 20 C.F.R. § 404.940; *Fisher v. Astrue*, No. 09-CV-3148, 2010 WL 2663084 at *13 (C.D. Ill. July 1, 2010). Because Williamson did not present her bias claim at the administrative level when she appealed Judge Cropper's 2005 decision, (*see* A.R. 15-17), the argument is waived, *see Fisher*, 2010 WL 2663084, at *13. But even if Williamson had presented the argument below, she has not come close to demonstrating that Judge Cropper's partial reliance on Dr. Hilger's report stems from or gives rise to the level of antagonism required to rebut this court's presumption that the ALJ's decision is unbiased. *See Keith*, 473 F.3d at 788.

Williamson next argues that the findings regarding her ability to concentrate are based on the ALJ's "own psychiatric opinion." (R. 42, Pl.'s Mem. at 20.) Williamson points out that Dr. Boyancheck opined that she could not handle normal work stress, and argues that the ALJ improperly substituted her opinion for Dr. Boyancheck's in concluding that Williamson

could stay on-task during the relevant period. Although it is true that "an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record," *Clifford*, 227 F.3d at 870, here Judge Cropper considered a number of medical sources in crafting the RFC. The ALJ noted that before January 2001 Williamson rarely had sought treatment for her alleged emotional problems and did not explain at the hearing why she failed to seek treatment. (A.R. 71.) The ALJ further noted that her pre-2001 medical records contained extensive notes from multiple doctors who were concerned with her overall well-being, but never observed signs of serious depression or reported that Williamson had complained of being seriously depressed. (Id.) The ALJ considered the opinions of Drs. Hilger and Lee, who found that Williamson had no mental impairments. (Id. at 67, 69.) Moreover, in crafting the RFC the ALJ noted that in 1996 Williamson's primary care physician had described her mental state as "completely normal." (Id. at 56.) And it is worth noting that it was not until seven months after Williamson's SSI onset date that Dr. Boyancheck opined that she could not handle normal work stress. Accordingly, the ALJ was entitled to conclude that Dr. Boyanchek's opinion was only minimally helpful in determining Williamson's RFC during the pre-2001 period.

Williamson also argues that the ALJ did not adequately explain her decision to reject Dr. Torres's opinion that her pain would have limited her ability to concentrate during the relevant period. Specifically, Dr. Torres signed an RFC questionnaire in May 2001 on which he checked a box stating that Williamson's pain would "frequently" interfere with her

attention and concentration. (A.R. 560.) But as the ALJ pointed out repeatedly in the course of her decision, several other doctors found that Williamson was exaggerating her symptoms, and the ALJ found her testimony regarding the extent of her pain to be less than credible. (Id. at 62-63.) It is the ALJ's job to resolve any conflicts in the medical evidence, *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995), and here the ALJ thoroughly explained her decision not to credit Dr. Torres's opinion regarding the limiting aspects of Williamson's pain. Because that explanation is supported by the evidence, it is sustained. *See Eichstadt*, 534 F.3d at 665-66.

Finally, Williamson lodges several objections to the ALJ's step-five conclusion that she could have performed a number of light and sedentary jobs during the relevant period. The ALJ gave three examples of light jobs and three examples of sedentary jobs that Williamson could have performed prior to 2001. Williamson now argues that five of those jobs are inconsistent with the ALJ's RFC assessment. Specifically, she argues that the jobs of laundry folder, general office clerk, and telephone research clerk all require more than occasional handling and grasping. She asserts that the definition of order caller in the Dictionary of Occupational Titles ("DOT") is outdated and argues that the vocational expert erroneously classified the job of telephone marketing clerk as semi-skilled rather than unskilled. Williamson does not challenge the ALJ's finding that she would have been able to work as a telephone quotation clerk, but instead argues that if only sedentary work is

available (and the job of telephone quotation clerk is classified as sedentary), she is entitled to a finding of disabled as of her 50th birthday.

As the Commissioner correctly points out in response, to the extent Williamson argues that the ALJ erred in finding that she was capable of performing specific categories of jobs, it is her task to show that the error was harmful. *See Shinseki v. Sanders*, 129 S.Ct. 1696, 1706 (2009). Even assuming for the sake of argument that the ALJ's RFC is inconsistent with respect to four of the six jobs to which the ALJ points, that leaves two available categories of work—telephone quotation clerk and order caller—which the vocational expert testified exist in the Chicago area in numbers greater than 2,500 and 1,200, respectively. Williamson does not persuasively argue that either of those jobs is inconsistent with the ALJ's RFC. With respect to the order caller job, Williamson simply asserts without support that the DOT is outdated and "[t]his position is now one that almost assuredly requires use of a computer." (R. 42, Pl.'s Br. at 23.) Counsel's unsupported speculation is insufficient to warrant a remand. *See, e.g., Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Williamson's only argument with respect to the job of telephone quotation clerk is her assertion that she is entitled to a finding of disability as of her 50th birthday if only sedentary positions are available. Williamson cites no authority for that proposition. Although Grid Rules 201.09 and 201.10 direct a finding of disabled if an ALJ concludes that a person closely approaching advanced age has an RFC that limits them to sedentary work, *see* 20 C.F.R. 404, Subpt. P, App. 2, Grid Rules 201.09, 201.10, those rules do not address a

situation where a claimant has an RFC that allows for both light and sedentary work. Williamson does not develop any argument explaining how the Grid Rules impact the step-five analysis, and it is not this court's role to develop the argument for her. *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002) (noting that "arguments that are unsupported by pertinent authority, are waived"). Accordingly, to the extent the ALJ's decision is overly broad and includes jobs that Williamson could not perform, Williamson has not shown that the error was harmful, because the jobs that remain are sufficient to support the ALJ's step-five conclusion. *See Coleman v. Astrue*, 269 Fed. App'x. 596, 602 (7th Cir. 2008) (finding harmless ALJ's failure to resolve conflict with respect to one job category where other job categories still available).

## Conclusion

The ALJ in this case was charged with the daunting task of determining from an extensive medical record the nature and effects of Williamson's physical and mental impairments during a period that ended years before the ALJ received the case. In concluding that Williamson was not disabled during that period, the ALJ thoroughly examined the evidence and built the requisite logical bridge from the evidence to her conclusion. Because the ALJ's conclusion is supported by substantial evidence and free of harmful error, Williamson's motion for summary judgment is denied and the decision of the Commissioner is affirmed.

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**